**FILED**

## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

2015 OCT 28 P 3: 19

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

|  |  |
|---|---|
| INSTITUTE FOR JUSTICE,<br><br>Plaintiff,<br><br>v.<br><br>MEDIA GROUP OF AMERICA, LLC,<br><br>  Serve:  Media Group of America, LLC<br>      Alex Skatell, Chief Executive Officer<br>      603 King Street<br>      Alexandria, VA 22314<br><br>IMGE, LLC<br><br>  Serve:  IMGE, LLC<br>      Alex Skatell, Officer and Member<br>      603 King Street<br>      Alexandria, VA 22314<br><br>    Defendants. | CIVIL NO. *1:15CV1410-LO/JFA* |

## VERIFIED COMPLAINT

Plaintiff, Institute for Justice ("Plaintiff" or "IJ") for its cause of action against Media Group of America, LLC ("MGA") and IMGE LLC ("IMGE") (collectively, "Defendants"), alleges as follows:

## JURISDICTION AND VENUE

1.  This action arises under Sections 32(1), 39, 43(a), 43(c) and 43(d) of the Federal Trademark Act of 1946, as amended, 15 U.S.C. §§ 1114(1), 1125(a) *et seq.* (the "Lanham Act")

and under related state statutes as well as the common law of the Commonwealth of Virginia. This Court has jurisdiction over the action pursuant to Section 39 of the Lanham Act, 15 U.S.C. § 1121, and 28 U.S.C. §§ 1331, 1338, 1367.

2. On information and belief, IJ and Defendants are residents of the Eastern District of Virginia and Defendants are within the jurisdiction of this Court for purpose of service and personal jurisdiction. The unlawful acts committed by Defendants, as hereinafter alleged, have been and are, in whole or in part, conceived, carried out and made effective within the Eastern District of Virginia. The interstate trade and commerce described hereinafter is carried out in part within this District. Thus, venue is proper in this district under 28 U.S.C. § 1391(b)(1), (2).

3. Those causes which arise under the common law and state law of Virginia are pendent or ancillary causes under 28 U.S.C. § 1338(b). This Court also has supplemental jurisdiction over the state law claims raised herein pursuant to 28 U.S.C. § 1367 because the state law claims are so related to the original jurisdiction federal claims raised herein that they form a part of the same case or controversy.

## THE PARTIES

4. Plaintiff IJ is a charitable 501(c)(3) corporation duly organized and existing under the laws of the District of Columbia with principal offices at 901 N. Glebe Road, No. 900, Arlington, Virginia 22203.

5. On information and belief, Defendant Media Group of America LLC is a limited liability company duly organized and existing under the laws of Delaware with principal offices at 603 King Street, Alexandria, Virginia 22314.

6. On information and belief, Defendant IMGE LLC is a limited liability company duly organized and existing under the laws of Delaware with principal offices at 603 King Street,

2

Alexandria, Virginia 22314. IMGE owns U.S. Trademark Ser. No. 86/326,737 for INDEPENDENT JOURNAL.

7.     On information and belief, Defendants are, and during the relevant time period have been, actively involved in and responsible for the unlawful and infringing acts complained of herein.

## BACKGROUND

8.     IJ is a not-for-profit organization with offices in the states of Virginia, Arizona, Florida, Illinois, Minnesota, Texas and Washington.

9.     IJ was founded in September 1991 as a non-partisan, non-profit, public interest law firm which has as its goal limiting the size and scope of government power to ensure that all Americans have the right to control their own destinies as free and responsible members of society.

10.     IJ combines cutting-edge litigation, sophisticated media relations, strategic research, boots-on-the-ground advocacy, public education and limited issue-specific legislative work to fight on behalf of those individuals who are denied their constitutional rights – in particular, First Amendment rights, school choice, economic liberty and private property rights.

11.     IJ litigates in federal and state courts across the country. Through the end of 2014, IJ has litigated nearly 200 cases and has won four of the five cases it litigated before the U.S. Supreme Court.

12.     IJ works extensively in the court of public opinion with a wide variety of publications and work in the news media. Communication with the public is an integral part of IJ's work and has been since IJ's inception. Communications infuses everything that IJ does – litigation, activism, strategic research, and legislative work. IJ has a significant communications

department. IJ produces press releases about all of its activities. It posts on its website, blogs, Facebook and other social media with news about cases and other activities. It organizes press conferences. It works with news reporters, editorial writers, investigative journalists, legal bloggers, and many other types of media and media personnel to disseminate news about IJ's work and the areas of interest to IJ. It seeks television, newspaper, magazine, video, newsletter, website, blog, digital native news, and social media coverage. Staff members of IJ communicate with the media on a daily basis.

13.    IJ also engages in significant original content creation. Its staff and fellows write both opinion and news pieces writing for print and online sources. It writes, films, and produces videos - in 2014 alone, IJ created 21 videos. And of course it writes the content for its own website and blogs. IJ has won more than 40 awards for its media work, including many awards for its website and videos.

14.    For example, IJ publishes a bi-monthly newsletter entitled Liberty & Law, which is distributed to over 23,000 subscribers throughout the United States. IJ also has published the "Liberty In Action" newsletter since Fall 2012, which currently has 14,000 subscribers. IJ also writes a "Liberty In Action" weblog, which is available on the Internet. IJ publishes a weekly newsletter about appellate cases, Short Circuit, which gives a wryly humorous take on federal appellate cases.  Short Circuit currently has 1,400 subscribers.  IJ maintains the "Make No Law" weblog, titled "IJ's Free Speech Blog"; the blog was active from June 2010 to March 2014 and is still accessible.

15.    In addition, IJ staff regularly contributes to Forbes.com, Buzzfeed.com, and HuffingtonPost.com, and also has published on Slate.com, TheAtlantic.com, TheHill.com, Politico, Daily Caller, Mic.com, Volokh Conspiracy, Washington Examiner, and many national

print and online outlets. In 2014 alone, IJ staff wrote more than 80 original pieces published by third parties.

16.    IJ also produces press releases about all of its work and is in regular contact with members of the media to publicize its work as well as relevant issues of the day. IJ is the subject of much unpaid publicity and has been featured in national websites, blogs, television and print media including The New York Times, The Wall Street Journal, The Washington Post, USA Today, Vox, NPR, Instapundit, National Review, American Spectator, Mashable.com, BusinessInsider.com, Jezebel.com, Vice.com, Salon.com, in articles by The Associated Press and columns by George Will, and in books.  Representative selection of publications attached hereto as Exhibit A show that the press, authors and other organizations have recognized and referred to Plaintiff as "IJ" since well before Defendant launched its service in 2012.

17.    Since as early as 1998, IJ has maintained an active presence on the internet through its website <ij.org>. Through the <ij.org> website, IJ promotes its services, makes available publications and research, expands its donor base, and communicates in support of its mission. The <ij.org> website receives scores of visitors from around the country and outside of the United States – in the last year, the website had 529,000 unique users, totaling 1.18 million page views.

18.    IJ maintains an active social media presence. It "tweets" under the handle "@IJ". "IJ" is prominently featured on its Twitter, Facebook and YouTube pages. IJ's Facebook page has 126,579 page "likes," or followers. Its Twitter page is followed by in excess of 28,900 individuals or groups. Its YouTube channel has over 15,000 subscribers and total views in excess of 5.3 million. One recent video published by IJ, "Running a Food Truck Shouldn't be this Hard," has had almost 230,000 views.

19.     IJ also conducts and publishes strategic research and studies about laws and policies. It disseminates this research through written and online publications. True and correct examples of the front pages of some of these publications are attached hereto as Exhibit B.

20.     In addition to its public education efforts through the media and activism, IJ is also involved in student education. The IJ Clinic also trains the next generation of attorneys to be fierce and creative advocates for entrepreneurs. IJ holds three day "boot camp" conferences for law students interested in public interest litigation. Hundreds of law students have attended these "boot camps" in addition to the thousands of activists who have received training from IJ.

21.     IJ also provides free legal assistance, support and advocacy for low-income entrepreneurs in Chicago through the IJ Clinic on Entrepreneurship.

22.     IJ has a team that educates and works with people on grassroots activism. IJ has educated and trained thousands of activists throughout the country. It has produced both written guides and videos, available on the Internet, to encourage standing up for one's rights as an entrepreneur and to be free from eminent domain abuse.

23.     IJ also has a legislative team working to make changes at the local, state, and federal government levels to pass pro-liberty legislation and defeat anti-liberty legislation. IJ's legislative activities include efforts to reform civil forfeiture, eminent domain, and occupational licensing laws.

24.     IJ's services, while non-partisan, appeal particularly to individuals and organizations with libertarian and conservative beliefs. However, several of IJ's issues appeal to people of all political persuasions and require working in coalitions of politically diverse groups. Thus, IJ's lack of association with any political party is extremely valuable to carrying out IJ's mission.

6

25.    Because IJ is a charitable 501(c)(3) organization, donations are tax-deductible. IJ relies on individuals (86% of donations) and charitable foundations (14% of donations) to provide the resources needed to defend the rights of its clients and thousands of others like them. IJ has a $20 million budget for fiscal year 2015. 8,000 donors supported IJ within the last 18 months.

26.    IJ has earned Charity Navigator's top 4-star rating every year since 2002. On information and belief, less than one percent of the charities rated have received this distinction 13 years running. This indicates that IJ consistently executes its mission in a fiscally responsible way and, according to Charity Navigator, is "well-positioned to pursue and achieve long-term change."

27.    As a 501(c)(3) organization, IJ must be organized and operated exclusively for exempt purposes set forth in section 501(c)(3) and may not be an action organization, i.e., it may not attempt to influence legislation as a substantial part of its activities and is absolutely prohibited from directly or indirectly participating in, or intervening in, any political campaign on behalf of (or in opposition to) any candidate for elective public office. Public statements of position (verbal or written) made on behalf of the organization in favor of or in opposition to any candidate for public office clearly violate this prohibition and could result in denial or revocation of IJ's tax-exempt status and the imposition of certain excise taxes.

28.    IJ adopted and began use of IJ by itself and in combination with other words and designs (the "IJ Marks") as a service mark in connection with its activities and services in 1991, and has used the name continuously and without interruption to the present day.

29.    IJ is the owner of all right, title and interest in and to the following federal registrations, which presently are valid and subsisting in law:

a.      U.S. Registration No. 2,365,966 - IJ INSTITUTE FOR JUSTICE CLINIC ON ENTREPRENEURSHIP and design for "Public interest legal services," with a date of first use in commerce of July 1, 1998;

b.      U.S. Registration No. 3,830,071 – IJ and Design for "promoting public awareness through outreach and communication efforts of the need for protection of individual liberties"; "education services, namely, training policy activists, lawyers, law students and others to identify, and bring to public attention, issues and cases in which individual liberties are threatened and to determine the appropriate means for redress; educational research services in the area of individual liberties and social affairs; publication of documents in the fields of individual liberties, public law and social affairs"; "providing public interest legal services focused on the protection of individual liberties; legal research in the area of public law" with a date of first use in commerce of September 1991;

c.      U.S. Registration No. 3,830,075 - INSTITUTE FOR JUSTICE IJ and Design for "promoting public awareness through outreach and communication efforts of the need for protection of individual liberties"; "education services, namely, training policy activists, lawyers, law students and others to identify, and bring to public attention, issues and cases in which individual liberties are threatened and to determine the appropriate means for redress; educational research services in the area of individual liberties and social affairs; publication of documents in the fields of individual liberties, public law and social affairs"; "providing public interest legal services focused on the protection of individual liberties; legal research in the area of public law" with a date of first use in commerce of September 28, 2006.

30.    True and correct copies of the federal certificates of registration for the registrations listed above are attached hereto as Exhibit C and incorporated herein by reference. These registrations are *prima facie* evidence of IJ's ownership of the IJ Marks and of its exclusive right to use the marks in connection with the services covered in the registrations. Each of these registrations has achieved incontestable status under Section 15 of the Lanham Act, 15 U.S.C. § 1065.

31.    IJ also is the owner of all right, title and interest in and to federal trademark application App. Ser. No. 86/544,485, filed on February 24, 2015 for IJ for "promoting public awareness through outreach and communication efforts of the need for protection of individual

8

liberties"; "education services, namely, training policy activists, lawyers, law students and others to identify, and bring to public attention, issues and cases in which individual liberties are threatened and to determine the appropriate means for redress; educational research services in the area of individual liberties and social affairs; publication of documents in the fields of individual liberties, public law and social affairs"; and "providing public interest legal services focused on the protection of individual liberties; legal research in the area of public law," with a date of first use in commerce of September 1991.

32.    As a result of IJ's longstanding use of the IJ Marks, IJ has built up substantial good will in such marks.

33.    IJ promotes its mark through paid advertising and publicity. In 2000, IJ adopted the slogans, "I am IJ" and "We are IJ" to promote its services and brand. It registered the domain name, "iamIJ.org". "I Am IJ" and "We Are IJ" advertisements were first created in March 2000 and appeared in May 2000 in School Reform News, a Heartland publication and IJ's April issue of Liberty & Law newsletter. IJ has placed "I am IJ" advertisements in every issue of Reason Magazine from 2001 to the present. In 2014 and 2015 alone, "I am IJ" and "We are IJ" advertisements have appeared in Reason Magazine, The Objective Standard, Philanthropy Roundtable, National Review and Natural Horse Magazine – IJ has thus far spent over $50,000 on these advertisements in 2014-15. True and correct samples of these advertisements are attached hereto as Exhibit D, and a summary of IJ's annual advertising expenses for the past ten years is attached as Exhibit E.  IJ also offers free downloads of an "I Am IJ" screensaver. True and correct examples of these uses, including a copy of the invitation to the opening of IJ's Texas state office in 2008 ("I am the Lone Star State. I am IJ"), are shown in Exhibit F hereto. IJ also uses the slogan "The IJ Way" on various media. [examples]

9

34.    IJ produces items with the IJ logo to promote its brand, such as clothing that has been sold to the general public, distributed to staff, attendees of conferences, partners, donors, and friends of IJ generally. IJ operated the online "IJ Freedom Market" featuring, among other things, sales of branded IJ merchandise from February 2006 until June 2012. True and correct examples of this merchandise are included in Exhibit G hereto.

35.    IJ does "acquisition" mailings, where it writes directly to potential donors and describes its areas of interest and recent cases; its letterhead and mailings prominently include the IJ Marks.  In 2014 alone, IJ sent close to 70,000 such pieces of mail.  A true and correct example of one such letter is attached as Exhibit H.

36.    IJ refers to each of its offices with "IJ" plus the geographic location of the office. Attached as Exhibit I hereto is true and correct copy of the invitation to the opening of IJ's Florida office in 2011, showing IJ Texas, IJ Arizona, IJ Minnesota, IJ-HQ (Virginia), and IJ Washington.

37.    Based on the extensive, exclusive and continued use of the IJ Marks by IJ, the relevant consuming public – including IJ's extremely valuable supporters, donors, clients and the judiciary – has come to recognize and does recognize the IJ Marks as being used by IJ, and the IJ Marks have come to identify in the public mind the distinctive activities of IJ.

38.    The IJ Marks are exceptionally valuable to IJ because of the goodwill and public recognition associated with them.

## EVENTS LEADING TO THIS CONTROVERSY

39.    Defendants are the publishers of a viral news website and social media pages. The original website was founded in 2012 and called the "Independent Journal Review". As described in further detail below, as of September 2015, Defendants have renamed its family of

media and advocacy services "Independent Journal" and adopted "IJ" as its primary brand and logo, despite full knowledge of IJ's claim of prior and superior rights. (Defendants' service is hereafter referred to as the "Independent Journal" to avoid confusion in this Complaint).

40. MGA is affiliated with IMGE, a digital agency that has worked with the Republican Governors Association and Karl Rove's Crossroads GPS. MGA was founded by two Republican political consultants, former Tim Pawlenty adviser Phil Musser and Alex Skatell, a former staffer for the National Republican Senatorial Committee.

41. As a result, the Independent Journal has been commonly dubbed as "the conservative version of *Upworthy*" (a viral news website that repackages and provides hyperlinks to liberal-leaning content). It has been described by Mr. Musser at the end of 2013 as, "seep[ing] into the edges of the conservative ecosystem as a place for news," and, on information and belief, has been ranked as the No. 1 Conservative Website for 2015 by Quantcast.com and No. 3 by Alexa.

42. Independent Journal maintains a category of articles chosen by its editorial staff. A review of these 'Editor's Choice" articles (http://ij.com/category/editors-choice/) reveals a conservative/libertarian bias. For example, a true and correct copy of a print out of the "Editor's Choice" page on ij.com on October 12, 2015 (Exhibit J hereto), reveals the following headlines:

- Ex-Staffer on Gowdy's Benghazi Committee Comes Forward With Message About Hillary Clinton: "There's wrongdoing here and I think it needs to stop."

- Here's Where Each Presidential Candidate Stands on Gun Rights: To ban or not to ban.

- If You Think Psychology Lacks Political Diversity, a Paper By These Researchers Confirms: "Self-selection" isn't enough to explain this...

- The House Held a Hearing on Planned Parenthood But 3 Other Things Dominated the Day: It wasn't what you'd call a productive hearing.

- Ted Cruz Unleashes Two Bombastic Predictions Every Trump Fan Will Want to Hear: 2016 just got more interesting.

- Congress Just Received All The Unedited Planned Parenthood Footage -- Here's the Next Step: The subpoena had two requests ...

- Darrell Issa Confirms He's Considering Bid for Speaker -- But Names Someone Else to Consider First: "...we need somebody who is (a) experienced; (b) has been a committee chairman..."

- Darrell Issa Considering Bid for Speaker of the House: "Americans want someone with a proven track record of holding this Administration accountable."

- After Kevin McCarthy Drops Out, House Rep. Says Words That are Music to Conservative Ears: Jason Chaffetz speaks out.

- House GOP Stunned After Kevin McCarthy Drops Out of Race to Replace Boehner: Stunning news leaves D.C. in shambles.

- Bobby Jindal's New Tax Plan Ensures That Every Single American Has 'Skin in The Game': It has one major difference with Trump's.

- Millennials are 'Feeling the Bern.' But Will They Be Burned After Learning More About His Proposals?: Sorry, Bernie.

- Mike Lee Takes His 'Conservative Case' for Justice Reform to DC's Most Conservative Crowd: "We know that no man is without sin..."

- Bernie Sanders Leads Hillary Clinton in New Nationwide Poll With First Debate in 6 Days: Poll results ahead of the first Democratic primary debate.

- If (And Possibly Why) Voters Watch the First Democratic Primary Debate Depends On Their Age: Demographics aren't necessarily destiny, but ...

- Strike On Afghan Hospital Called a 'War Crime.' Now a US General Has His Say...: A U.S. general and a military analyst have their say.

- Can Hillary Afford to Skip an Early Primary State? Clinton Camp Split Over Strategy in New Hampshire: "I look at New Hampshire and I say, 'um, yeah, whatever.'"

- New ACLU Lawsuit Could Change How Every Catholic Hospital in America Handles Abortion: The ACLU is taking a new approach...

- What You Need to Know About the House Republicans Trying to Replace Boehner: It is anyone's game...

- Stylist to the (Political) Stars Tells Us Why Hair Matters in Washington & 2016: Meet Cristophe Schatteman.

- An 89-Year-Old WWII POW & A Korean War Veteran Weigh In: What Makes Someone An Adult?: Legendary advice...

- These House Democrats Want to Allow Unauthorized Immigrants to Enroll in Obamacare: "[T]he Pope's visit certainly inspired me to think about the moral examples he sets ..."

- Trump Supporters Tend to Have This Major Thing in Common: It all ties in to this...

43.   The headlines from the "Editor's Choice" articles largely regard political subjects, and appeal to individuals with conservative and/or libertarian beliefs.

44.   On information and belief, Independent Journal also regularly reports on legal issues, including many of the same issues that IJ litigates about such as First Amendment protection, school choice, and property rights.

45.   Independent Journal operates two Facebook pages that are more akin to conservative online political communities or activism groups than a media information source. The Facebook group "I Am Conservative" (https://www.facebook.com/iamconservative) was recently re-branded to "IJ America," described as "We are joining together to give a real voice to Americans across the country. I think therefore IJ". The page features a profile picture of former president Ronald Reagan. A true and correct print out of the IJ America Facebook page as of October 27, 2015 is attached as Exhibit K.

46.   As a news organization, Independent Journal is permitted to engage in activities that are prohibited to IJ. For example, Independent Journal may publicly endorse, support or oppose political parties and candidates for political office; accept paid political advertising from certain candidates; support political fundraising; sell or rent mailing lists to certain political parties or candidates; and make contributions to a political organization. Moreover, as a for-

profit entity, Independent Journal may sponsor debates that do <u>not</u> invite all qualified candidates, do <u>not</u> have an independent panel, do <u>not</u> cover a broad range of issues, do <u>not</u> give each candidate an equal opportunity to speak, and may indicate support for or opposition to any candidate, explicitly or through biased presentation of topics or questions.

47.    Independent Journal started to refer to itself as "IJ Review" at inception. Since 2012, however, Independent Journal has migrated toward the "IJ" moniker, including, as of today:

- A slogan, "I think therefore IJ";

- Twitter handles @IJdotcom, @IJreview (according to the Twitter page, "the opinions and contributor vertical for @IJDOTCOM), and @IJ_Politics (the "politics vertical of @IJDOTCOM") and @IJ_LIFT ("a vertical of @IJDOTCOM that covers everything from Life, Inspiration, Family and Trends");

- Facebook sites IJ Review and IJ Politics (both showing the logo "IJ."), IJ America, and IJ Lift;

- Emails with news summaries titled "IJ" and "IJ Wrap,"

- Online newsletter termed IJ Lift;

- Referring to itself simply as "IJ Review" or "IJ."

48.    Moreover, on June 17, 2015, Independent Journal announced that it would co-host a Republican candidate debate with ABC News on February 6, 2016. Mr. Skatell announced, "New Hampshire voters are independent-minded, they love their country and just plain enjoy discussing politics, and that means New Hampshire is truly IJ country."

49.    On information and belief, Independent Journal was included as a co-host due to the Republican National Committee requirement that debates include a "conservative media element."

50.    On information and belief, Independent Journal will extensively use "IJ" in connection with its co-hosting the Republican debate on February 6, 2016, including in the form of advertisements and promotional materials using "IJ" to identify Independent Journal. The debate will be televised. Thus, the use of "IJ" by Independent Journal in connection with advertisements and promotional materials will be viewed by millions of people.

51.    Use of "IJ" by Defendant in connection with the Republican debate, or any partisan politics, will be extremely damaging to IJ. IJ maintains positive relationships with people, including the judges before whom IJ attorneys appear, of all political beliefs and affiliations. Because IJ is non-partisan, any association of the IJ Marks with a political or partisan event will lead the public to falsely believe that IJ is favoring one party or candidate over another.

52.    After Defendant announced it will host the February 6, 2016 Republican debate, IJ became increasingly concerned over reports it was receiving of growing actual confusion, including reports from its donors and the news media. These concerns were magnified in August 2015, when IJ learned that - with full knowledge of IJ's rights, Defendants re-branded as "Independent Journal" and adopted "IJ" as a trademark, along with the "IJ" logo, shown below:



53.    Independent Journal also has changed its website domain name to <ij.com>, and on or about September 20, adopted the Twitter handle @IJdotcom.

54.    Search engines such as Google return both ij.org (IJ's website) and ij.com (Defendant's website) cheek by jowl on the first page of search results when the term "ij" is searched.

55.    Use of the confusingly similar ij.com and ij.org domain names, as well as confusingly similar social media handles, will create initial interest confusion among the public, including potential clients, donors and organizations looking to affiliate with IJ, which are looking for information on IJ's history and services.

56.    IJ has received notice of instances of actual confusion. By way of example only: A daily media update on campaign finance and political speech developments prepared by the Center for Competitive Politics incorrectly attributed one of Defendant's articles to IJ, titling the blurb, "Institute for Justice: Americans' Support for First Amendment Weakens During Times Of National Crisis (Infographic)." The Center made this error notwithstanding its close working relationship with IJ, which includes filing amicus briefs in cases in which the other organization represents a party.  A true and correct print out of this email is attached as Exhibit L.

      a.    IJ's Assistant Director of Production and Design, Isaac Reese, reported that he was at a happy hour speaking with a friend and a colleague from Freedom Partners. Upon hearing that Mr. Reese worked for IJ, the individual stated that he loved IJ's "Ted Cruz machine gun bacon video", referring to a viral video featuring Ted Cruz that was published by Defendants on YouTube.

      b.    A supporter of IJ reported that he was initially confused by emails from Independent Journal that appeared in his inbox, and "I thought they were a little off the normal IJ topic. I read them thinking they were from you." A true

and correct print out of an email reporting this confusion is attached as Exhibit M.

c.  Mindy Menjou, a Research Editor for IJ, reported that several individuals in the broader liberty movement have asked her during in-person conversations (including recently, at a party with former colleagues on August 8, 2015) if IJ publishes IJ Review.

d.  Dan Alban, an attorney with IJ, reported that he has encountered this confusion on several occasions, such as one time at New Hampshire Liberty Forum in February 2014 when one of the conference organizers from the Free State Project assumed that he worked for Defendant rather than for IJ.

e.  Another supporter of IJ wrote to IJ, "What's going on with your IJR and it's postings. In past three weeks I've received and thoroughly enjoyed your editors selection of mostly eye-popping videos. However it is a change in style...and wondering if I should hire same internet pr strategist/expert for my firm...I got impression that your posts had drifted afield from litigation issues (ie eminent domain) into generic hi, or low, libertarian political humor." This email, referring to "IJR," clearly refers to Defendant's publications. A true and correct print out of an email reporting this confusion is attached as Exhibit N.

f.  An IJ supporter asked IJ, "Do you know that there is an active 'journal' on the Net that could easily be trading on the Institute for Justice name recognition? They go by IJReview and I often click on them by mistake." A true and correct print out of an email reporting this confusion is attached as Exhibit O.

g.  Multiple tweets on the Twitter service have referred to Defendant using IJ's Twitter handle @IJ. A true and correct print out of these tweets is attached as Exhibit P.

## IJ'S DEMANDS THAT DEFENDANTS STOP USING IJ HAVE BEEN REBUFFED.

57.  IJ has repeatedly demanded that Independent Journal stop using the IJ Mark. On or about February 4, 2015, IJ's Managing Vice President, Steven Anderson, emailed Ryan Coyne, who on information and belief is Chief Financial Officer for IMGE, MGA and Independent Journal, regarding IJ's superior rights in the IJ Marks and of growing actual confusion between IJ and Defendants' use of the designation "IJ Review." IJ asked Mr. Coyne to discuss with him possible ways to avoid confusion.

58.  On or about February 4, 2015, Mr. Coyne responded to Mr. Anderson, and agreed to schedule a call. Mr. Coyne indicated his awareness of IJ, stating that, "As the matter of fact, we run another company called IMGE which currently has a proposal in to Justin Wilson, IJ's Director of Communication, to rebuild the IJ website. I would love to meet and talk about what we can do on that front as well as the IJ Review." Over the next few days, Mr. Coyne and Mr. Anderson agreed to speak on February 13, 2015. True and correct copies of the February 4, 5 and 6 emails between Mr. Anderson and Mr. Coyne are attached hereto as Exhibit Q.

59.  Mr. Coyne and Mr. Anderson did speak via telephone on February 13, 2015, but did not resolve the issues. They agreed to speak again in a few weeks after Mr. Coyne had a chance to speak to his superiors.

60.  On March 2, 2015, Mr. Anderson again emailed Mr. Coyne and asked if he had availability to resume the discussion. A true and correct copy of the March 2 email is attached hereto as Exhibit R. Mr. Anderson did not receive any response to the March 2 email.

61.    On April 17, 2015, Mr. Anderson again emailed Mr. Coyne and again asked if he had availability to resume the discussion. A true and correct copy of the April 17 email is attached hereto as Exhibit S. Mr. Anderson did not receive any response to the April 17 email.

62.    IJ retained legal counsel and, on the last day of August, 2015, sent a cease and desist letter to Independent Journal demanding that it stop all use of "IJ" as a mark, alone or as "IJ Review." A true and correct copy of that letter is attached as Exhibit T. IJ and Independent Review met with Defendants' counsel and principal on September 21, 2015, but did not reach agreement.  Thereafter, Independent Journal proposed an agreement that would allow it to continue to freely use and promote "IJ" as its own mark. IJ had already made clear that this proposal was not acceptable. The growing confusion between the organizations is becoming so pervasive and so damaging to IJ's brand, IJ has no choice but to commence these proceedings.

### THE USE OF IJ MARKS BY INDEPENDENT JOURNAL ARE CONFUSING AND DAMAGING TO IJ

63.    The use of the designation "IJ" when applied to the services and activities of Defendants and the Independent Journal has caused and will continue to cause confusion, mistake and/ or deception.

64.    Any defect, objection or fault found with any activities of Defendants under the designation "IJ" will injure the exceedingly valuable reputation and goodwill that IJ has established for its services provided IJ Marks.

65.    Confusion between the use of "IJ" by Defendants and IJ is exceedingly damaging to IJ, which cannot legally engage in the political activities that Defendants can, and are, engaged in.

66. Defendants' actions in infringing the IJ Marks are, and have been, deliberate, flagrant and in bad faith.

## COUNT I
## FEDERAL TRADEMARK INFRINGEMENT

67. IJ realleges and incorporates by reference the allegations contained in Paragraphs 1 through 66 above.

68. Defendants' activities as stated herein are carried out in interstate commerce and affect the business activities of IJ carried out in interstate commerce.

69. IJ and Defendants are offering overlapping and related services under their respective names and marks in interstate commerce.

70. On information and belief, the parties utilize, in the rendering of their services, substantially the same or similar channels of trade for advertising and promotional activities related to their endeavors.

71. On information and belief, the parties' services appeal to individuals and groups with conservative and libertarian beliefs who are interested in politics, law and policy.

72. At the time Defendants adopted and began to use the designation "IJ" as a trade name and trademark for its services, IJ possessed valid common law, state and federal statutory rights in the IJ Marks.

73. By reason of IJ's prior adoption and use of IJ and its federally registered IJ Marks, IJ's rights in and to IJ and the IJ Marks are superior to and supersede Defendants' rights in the designation "IJ."

74. Defendants, at the time it adopted and first used the designation "IJ," were on constructive notice, pursuant to Section 22 of the Lanham Act, 15 U.S.C. § 1072, of the

existence of IJ's superior rights in its IJ Marks by reason of the existence, at that time, of IJ's aforestated federal service mark registrations.

75.    Defendants, at the time they re-branded to "IJ" and the "IJ." logo, were on actual notice of the existence of IJ's superior rights in its IJ Marks and the existence of actual confusion.

76.    Use by Defendants of the designation "IJ" is without the permission or authorization of IJ.

77.    The marks and names used by the parties are substantially identical in point of law and fact, in view of the likeness in sound, meaning and appearance.

78.    Defendants' use of the "IJ" designation has caused and is likely to continue to cause confusion, mistake and/or deception among consumers and the public, leading the public falsely to believe that Defendants' services are those of, are sponsored or approved by, or are in some way connected with IJ.

79.    Defendants' use of the "IJ" designation has caused and will cause damage to IJ.

80.    Defendants' use of the designation "IJ" as described herein constitutes direct infringement of IJ's federal trademarks in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

81.    Defendants' infringement and violation of IJ's trademark rights has injured and will injure IJ and the public, causing damage for which IJ is entitled to relief.

82.    This is an exceptional case pursuant to 15 U.S.C. § 1117(a) entitling IJ to an award of attorney's fees.

## COUNT II
## SECTION 43(a)

83.    IJ realleges and incorporates by reference paragraphs 1 through 82 above.

21

84. By reason of IJ's prior adoption and use of the IJ trademark, IJ's rights in and to that name are superior to and supersede Defendants' right to use "IJ" as a designation for identical and closely-related services.

85. Defendants' acts as stated herein deceive and tend to deceive the public into believing, falsely, that Defendants' services are those of, are sponsored or approved by, or are in some other way connected with IJ, all to the irreparable injury of IJ's trade and goodwill and to the injury of the public.

86. Said acts constitute unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

87. Defendants' infringement and violation of IJ's trademark rights have injured and will injure IJ and the public, causing damage for which IJ is entitled to relief.

**COUNT III**
**STATE LAW TRADEMARK INFRINGEMENT**

88. IJ realleges and incorporates by reference Paragraphs 1 through 87 above.

89. Defendants have used in commerce "IJ" in connection with its business.

90. Defendants' use in commerce of "IJ" in connection with MGA's services is likely to cause confusion or mistake or to deceive as to the source of origin of those services.

91. The above-described acts of Defendants constitute trademark infringement in violation of Va. Code Ann. § 59.1-92.12, entitling IJ to relief.

**COUNT IV**
**COMMON LAW TRADEMARK INFRINGEMENT**

92. IJ incorporates by reference Paragraphs 1 through 91 above.

93. The IJ Marks are distinctive and have developed secondary meaning in the public mind in that consumers come to know and recognize the IJ Marks as identifying the services and activities of IJ.

94. Defendants' use in commerce of "IJ" in connection with MGA's services is likely to cause confusion or mistake or to deceive as to the source of origin of those services.

95. Defendants' use of "IJ" therefore constitutes common law trademark infringement, for which IJ has suffered damages and is entitled to relief.

### COUNT V
### COMMON LAW MISAPPROPRIATION

96. IJ incorporates by reference Paragraphs 1 through 95 above.

97. The public is likely to be confused, deceived or otherwise manipulated by the Defendants' use of confusingly similar "IJ" designations.

98. Defendants' use of "IJ" designations therefore constitutes common law misappropriation, for which IJ has suffered damages and is entitled to relief.

### PRAYER FOR RELIEF

**WHEREFORE,** IJ prays to the Court as follows:

1. That the Court enter a judgment that Defendants have infringed the rights of IJ in the IJ Marks in violation of 15 U.S.C. § 1114(1), 15 U.S.C. § 1125(a); Va. Code Ann. § 59.1-92.12 and common law;

2. That the Court enter an order preliminarily and permanently enjoining Defendants, their agents, servants, employees, attorneys, and all those persons in active concert or participation with any of them, from:

a. Using in connection with their services or activities any trademark, service mark, name or designation of any kind that is confusingly similar to the IJ Marks;

23

b.      Using in connection with their services or activities any social media account name or "handle" including or that are confusingly similar to the IJ Marks;

c.      Otherwise competing unfairly with IJ in any manner; and

d.      Conspiring with, aiding, assisting or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs (a) through (c) above;

3.      That Defendants be ordered to transfer the domain name <ij.com> to IJ;

4.      That all papers, documents, advertising materials, signs and and/or all other materials utilizing the designation IJ be destroyed or delivered to the Court for destruction;

5.      That the costs of this action, including reasonable attorneys' fees for IJ's attorneys, be taxed against Defendants; and

6.      That the Court grant such other and further relief as it may deem just and proper.

Respectfully submitted,

By: _____

Christopher Mills (Va. Bar No. 44358)
Christopher Kelly (*pro hac vice* to be filed)
Jennifer L. Elgin (*pro hac vice* to be filed)
WILEY REIN LLP
1776 K Street NW
Washington, DC 20006
Telephone: (202) 719-7000
Facsimile: (202) 719-7049
Attorneys for Plaintiff Institute for Justice

## VERIFICATION

I, Steven Anderson, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that

the facts contained in the foregoing Verified Complaint are true and correct.

_____
Steven Anderson

_____
Date

25