

NOV 3 0 2015

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

|  |  |  |
|---|---|---|
| INSTITUTE FOR JUSTICE, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:15-cv-1410 |
| | ) | |
| MEDIA GROUP OF AMERICA, LLC, and IMGE, LLC, | ) | |
| | ) | |
| *Defendants.* | ) | |

### Memorandum Opinion

This matter comes before the Court on Plaintiff Institute for Justice's Motion for Preliminary Injunction. (Dkt. 4). The Institute of Justice seeks to halt the Defendants' use of "IJ" in connection with their website, the Independent Journal Review, as a violation of the Lanham Act. A preliminary injunction is an extraordinary remedy that places a very high burden on the Plaintiff. Nevertheless, Plaintiff has presented a compelling case of trademark infringement and high likelihood that it will suffer irreparable harm in the coming months if an injunction is not issued now. Accordingly, and as explained in more detail below, the Motion for Preliminary Injunction is GRANTED.

**I.     Background**

The Institute of Justice is a not-for-profit, non-partisan public interest law and policy firm. Complaint, Dkt. 1, at ¶¶ 8-9. It combines litigation, media, advocacy, and education to further its goals of limiting the size and scope of government and protecting individual liberties. *Id.* ¶ 10. While non-partisan, the Institute of Justice's services appeal to individuals and

organizations with libertarian and conservative beliefs. *Id.* ¶ 24.  The Institute was founded in

1991. *Id.* ¶ 9.  At that time is started using the following registered trademark:



*Id.* ¶ 29.  It has used this marks continuously since 1991. *Id.* ¶¶ 28-29.  The Institute for Justice

has also registered the following two marks, which it began to use in 1998 and 2006,

respectively:





*Id.*  On February 24, 2015, the Institute for Justice applied to the Trademark Office to register

"IJ" in typed format, "without claim to any particular font, style, size, or color." ("standalone

'IJ'") *Id.* ¶ 31; Def. Ex. 2; Dkt. 15, at 29.  This application was rejected by the Trademark Office

on June 1, 2015, and returned to the Institute of Justice for amendment and/or correction.  Def.

Ex. 2; Dkt. 15, at 26-32.  The rejection specifically noted that the "application omit[ted] the

required verified statement that the mark is in use in commerce on or in connection with the services listed in the application." *Id.* at 30.

The Institute of Justice has maintained an active presence on the Internet since 1998 through its website <ij.org>. Complaint, Dkt. 1, at ¶ 17. It also maintains a Facebook page, YouTube channel and Twitter handle <@ij>. *Id.* ¶ 18. The Institute of Justice produces branded merchandise and advertisements. *Id.* ¶¶ 33-36. In 2014-15 the Institute of Justice spent over $50,000 on its "I am IJ" and "We are IJ" advertising campaign. *Id.* ¶ 33.

Defendants, Media Group of America and IMGE, founded a website in 2012 entitled the "Independent Journal Review." *Id.* ¶ 39. It is often called the "IJ Review" or simply "IJ." *Id.* ¶ 47. The Independent Journal is a news website that appeals to those with conservative and libertarian political views. Id. ¶ 42. The Independent Journal is a top 100 website with consistent traffic exceeding 20 million unique visitors per month. Def. Ex. 1, Dtk. 15, at 25.

On June 17, 2015, the Independent Journal announced that it would co-host a Republican Candidate debate in New Hampshire on February 6, 2015. Complaint, Dkt. 1, ¶ 48. In August of 2015, Defendants "re-banded" the Independent Journal as "IJ" and adopted the following logo:



*Id.* ¶ 52. The Independent Journal then changed its web address to <ij.com> and adopted the Twitter handle <@IJdotcom>. *Id.* ¶ 53. It also began using "IJ" in its emails, on its Facebook pages, and in its online newsletter. *Id.* ¶ 47.

The Institute of Justice claims that the Independent Journal's actions described above are infringing on its trademarks. The Complaint provides several anecdotes describing people who have confused the Independent Journal with the Institute of Justice starting as early as February 2014. *Id.* ¶ 56. The Institute of Justice's Managing Vice President Steven Anderson contacted the Independent Journal in February of 2015 about the confusion. *Id.* ¶¶ 57-59. The parties spoke on February 13, 2015, but were unable to resolve the dispute at that time. *Id.* After several additional attempts to contact the Independent Journal regarding the issue via email, the Institute of Justice sent a cease and desist letter to the Independent Journal on August 31, 2015. *Id.* ¶62. The parties met to discuss the issue on September 21, 2015, but were still unable to resolve the dispute. *Id.* The Institute of Justice then filed this case and its Motion for a Preliminary Injunction on October 28, 2015. *Id.*; Dkt. 4.

## II.     The Legal Standard

In order to succeed on a request for preliminary injunction, the movant "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 20 (2008); *see also Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 188 (4th Cir. 2013). A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

## III.    Analysis

### A. Likelihood of Success on the Merits

Under the *Winter* test, the Institute of Justice must first establish that it is likely to succeed on the merits of its claims. 555 U.S. at 20. The Institute of Justice has brought claims

4

of Federal Trademark Infringement, violations of section 43(a) of the Lanham Act, trademark infringement under Virginia law, common law trademark infringement, and common law misappropriation. However, the request for a preliminary injunction focuses solely on the Lanham Act claim.

"To establish trademark infringement under the Lanham Act, a plaintiff must prove: (1) that it owns a valid mark; (2) that the defendant used the mark 'in commerce' and without plaintiff's authorization; (3) that the defendant used the mark (or an imitation of it) 'in connection with the sale, offering for sale, distribution, or advertising' of goods or services; and (4) that the defendant's use of the mark is likely to confuse consumers." *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 152 (4th Cir. 2012) (quoting 15 U.S.C. § 1114(a)). The Court will address each of these elements in turn.

### (1) Whether the Institute of Justice Owns a Valid Mark

In proving trademark infringement under the Lanham Act, the plaintiff first must establish that it owns a valid mark. *Id.* "Under the Lanham Act, the issuance of a certificate of registration arms the registrant with 'prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark.'" *Retail Servs., Inc. v. Freebies Publ'g*, 364 F.3d 535, 542 (4th Cir. 2004) (quoting 15 U.S.C.A. § 1057(b)). The Institute of Justice has three trademarks registered with the Patent and Trademark Office: "IJ INSTITUTE FOR JUSTICE CLINIC ON ENTREPRENEURSHIP and Design;"[1] "IJ and Design;"[2] and

---

[1] U.S. Registration No. 2,365,966.
[2] U.S. Registration No. 3,830,071.

"INSTITUTE FOR JUSTICE IJ and Design."[3] Dkt. 1, at ¶ 29. These registrations are thus prima facie evidence that the marks are valid and are owned by the Institute of Justice.

Defendants, however, argue that these three trademarks are not at issue in this case. Rather, Defendants argue that the use of "IJ" generally is at issue and that Plaintiff has no trademarks rights in this standalone "IJ." Plaintiff has submitted an application for trademark registration of the standalone "IJ." Plaintiff has applied to the Trademark Office to register the standalone "IJ." This application was rejected by the Trademark Office on June 1, 2015,[4] and returned to the Institute of Justice for amendment and/or correction.

Because Plaintiff has not yet successfully registered the standalone "IJ" with the Trademark Office, the Court cannot presume its validity. Nevertheless, unregistered marks can still receive common law protection under Section 43(a) of the Lanham Act. *See Microstrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 341 (4th Cir. 2001). In order for an unregistered mark to receive trademark protection, (a) it "must be used in commerce" and (b) it "must be distinctive." *Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Estrangers a Monaco*, 329 F.3d 359, 363 (4th Cir. 2003).

### (a) Whether Plaintiff has Used the Standalone "IJ" in Commerce

"[A] mark is used in commerce only if it accompanies services rendered in commerce, i.e., it is employed appurtenant to an established business or trade that is in commerce." *Id.* at 364. Defendants argue that the Institute of Justice never actually uses a standalone "IJ" to promote its legal services. Rather, they maintain that the Institute of Justice always uses the "IJ" as part of a larger stylized registered trademark, such as in the flame logo. Accordingly,

---

[3] U.S. Registration No. 3,830,075.
[4] Plaintiff maintains its application was partially refused because the standalone IJ is confusingly similar to a registered IJ mark used in connection with credit management services. Plaintiff is pursuing a consent agreement with the holder of this mark and insists that its application will eventually be approved by the Trademark Office.

Defendants argue the Institute of Justice cannot receive common law protection for the standalone "IJ." In support of this argument Defendants point out that the Trademark Office refused the Institute of Justice's application for protection of a standalone "IJ" because the application "omit[ted] the required verified statement that the mark is in use in commerce or in connection with the services listed on this application." Def. Ex. 2, Dkt. 15, at 30.

Plaintiff insists that it has widely used a standalone "IJ" for years to identify and distinguish the Institute of Justice and its services. Plaintiff has provided to the Court a host of examples of when it has used a standalone "IJ," in both serif and sans serif font, to identify itself and its services, including emails, letters, holiday cards, calendars, promotional materials, and advertisements. Based on these exhibits, the Court can fairly conclude that Plaintiff has used a standalone "IJ" in commerce in connection with its established legal and policy services, communications, and educational outreach.

### (b) Whether the Standalone "IJ" is Distinctive

In determining how distinctive a mark is, "the Fourth Circuit employs the system established by Judge Friendly of the Second Circuit for classifying marks." *Swatch, S.A. v. Beehive Wholesale, LLC*, 888 F. Supp. 2d 738, 748 (E.D. Va. 2012). Word marks are classified into four different categories: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. *See Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir.1976). "Under this hierarchy of distinction, generic marks receive no protection, descriptive marks require proof of secondary meaning to be eligible for protection, while suggestive and fanciful marks are inherently distinctive." *Swatch*, 888 F. Supp. 2d at 748.

Plaintiff maintains that the USPTO has determined that the standalone "IJ" is inherently distinctive as evidenced by the fact that the USPTO has never required a descriptiveness

disclaimer or claim of acquired distinctiveness for "IJ" in its trademark application. Plaintiff cites *RFE Indus., Inc. v. SPM Corp.*, 105 F.3d 923, 926 (4th Cir. 1997), a case in which the Fourth Circuit concluded that the USPTO's issuance of a certificate of registration without requiring the applicant to show proof of secondary meaning "is powerful evidence that the registered mark is suggestive and not merely descriptive." While the USPTO has not required Plaintiff to show secondary meaning of the standalone "IJ," it has also not yet issued the registration. Thus, at this time, the Court cannot assume that the standalone "IJ" is inherently distinctive.

While Plaintiff has argued that the standalone "IJ" is inherently distinctive, Plaintiff has not made a clear argument for which category this Court should place the standalone "IJ" in. Defendants argue that the Fourth Circuit disfavors treating abbreviations as something other than descriptive and insists that the standalone "IJ" must be descriptive simply because it is an abbreviation. Dkt. 15, at 10. This is a misreading of the Fourth Circuit's decision in *George & Co. LLC v. Imagination Entertainment Ltd.*, 575 F.3d 383, 394-95 (4th Cir. 2009). In that case the Fourth Circuit stated that "[a]n abbreviation of a descriptive term which still conveys to the buyer the descriptive connotation of the original term will still be held to be descriptive." *Id.* Thus, an abbreviation will only be considered descriptive if the underlying term is considered descriptive and the abbreviation functions similarly. *Id. See also* 1 McCarthy on Trademarks and Unfair Competition § 7:18 (4th ed.) ("Americans are prone to abbreviate recognized trademarks and to use nicknames. Such abbreviations and nicknames are just as entitled to legal protection as the original full trademark."). Further, as Plaintiff points out, acronyms are sometimes considered inherently distinctive despite the descriptive status of their underlying mark, for example "IBM" and "UPS."

8

The underlying term in this case, "Institute for Justice," is best categorized as a suggestive mark: it does not directly describe the services Plaintiff supplies, but it does suggest them. The "Institute of Justice" is also neither fanciful nor arbitrary because it is neither a made-up word nor is it completely unrelated to the Plaintiff's services. The abbreviation "IJ" can correspondingly be categorized as a suggestive mark. As suggestive marks are considered inherently distinctive, this Court can fairly conclude that the standalone "IJ" is inherently distinctive.

Because Plaintiff has shown that it uses the standalone "IJ" in commerce and that the standalone "IJ" is inherently distinctive, Plaintiff has established that it likely possesses common law rights in the mark. By establishing this, Plaintiff has shown that it is likely to satisfy the first element of a claim of trademark infringement under the Lanham Act.

### (2)/(3) Whether Defendants Used the Mark in Commerce Without Plaintiff's Authorization in Connection with Good or Services

The next two elements of trademark infringement under the Lanham Act are: "(2) that the defendant used the mark 'in commerce' and without plaintiff's authorization; [and] (3) that the defendant used the mark (or an imitation of it) 'in connection with the sale, offering for sale, distribution, or advertising' of goods or services." *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 152 (4th Cir. 2012) (quoting 15 U.S.C. § 1114(a)). Plaintiff has presented evidence that Defendants have used and continue to use the standalone "IJ" in connection with its news-gathering website, the Independent Journal Review. Plaintiff further maintains that it never gave Defendants authorization to use the "IJ." Defendants do not contest these points. Therefore, the Court concludes that Plaintiff is likely to eventually establish these two elements of its trademark infringement claim.

<u>(4) Whether Defendants' Use of the Mark is Likely to Confuse Consumers</u>

The Independent Journal next contests the forth element of Plaintiff's Lanham Act claim: whether the Independent Journal's use of the mark is likely to confuse consumers. The Fourth Circuit has identified nine factors that are relevant to the likelihood of confusion:

> (1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the markholders; (5) the similarity of advertising used by the markholders; (6) the defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the consuming public.

*Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 153 (4th Cir. 2012). While these nine factors are generally relevant, "[t]his judicially created list of factors is not intended to be exhaustive or mandatory." *Id.* at 154.

### *(a) The Strength and Distinctiveness of the Institute of Justice Marks*

Courts evaluate the first likelihood of confusion factor, the strength of the trademark, by evaluating the marks "conceptual strength and commercial strength." *CareFirst of Maryland, Inc. v. First Care, P.C.*, 434 F.3d 263, 269 (4th Cir. 2006). A mark's conceptual strength is a measure of the mark's distinctiveness and "the linguistic or graphical peculiarity of the mark." *Id.* (quotation omitted). The commercial strength of a mark is a measure of whether present or prospective customers understand that the mark, when used in connection with a business, refers to the particular person or enterprise that the mark is meant to identify. *Id.* (quotations omitted); *see also Food Fair Stores, Inc. v. Lakeland Grocery Corp.*, 301 F.2d 156, 160-61 (4th Cir. 1962).

Plaintiff first argues that its registration of its three marks give rise to a conclusive presumption that the marks are distinctive. However, as discussed above, the three registered

marks are not at the heart of this dispute, rather the standalone "IJ" is. Thus, the Court must assess the conceptual and commercial strength of the standalone "IJ."

### (i) The Conceptual Strength/Distinctiveness of the IJ Mark

As discussed in Part III.A(1)(b), "[t]he Fourth Circuit employs the system established by Judge Friendly of the Second Circuit for classifying marks and determining conceptual distinction." *Swatch, S.A. v. Beehive Wholesale, LLC*, 888 F. Supp. 2d 738, 748 (E.D. Va. 2012). Word marks are classified into four different categories: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. *See Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir.1976). "Under this hierarchy of distinction, generic marks receive no protection, descriptive marks require proof of secondary meaning to be eligible for protection, while suggestive and fanciful marks are inherently distinctive." *Swatch*, 888 F. Supp. 2d at 748. As discussed in depth above, the standalone "IJ" can fairly be categorized as a suggestive mark that is inherently distinct.

### (ii) The Commercial Strength of the IJ Mark

The commercial strength of Plaintiff's mark "ultimately depends on the degree to which the designation is associated by prospective purchasers with a particular source." *Petro Stopping Centers, L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 93 (4th Cir. 1997) (quotations omitted). The commercial strength inquiry is similar to the "secondary meaning" inquiry. *George*, 575 F.3d at 395. The Fourth Circuit considers six factors in assessing secondary meaning: "(1) the plaintiff's advertising expenditures; (2) consumer studies linking the mark to a source; (3) the plaintiff's record of sales success; (4) unsolicited media coverage of the plaintiff's business; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the plaintiff's

use of the mark." *Id.* Plaintiff's opening brief only clearly discussed the first and sixth factors. Plaintiff's reply brief then touched on several of the other factors.

As to the first factor, Plaintiff asserts that it spent approximately $50,000 from 2014-15 on advertisements. These advertisements prominently feature the standalone "IJ." Plaintiff has not stated how many advertisements were purchased with the $50,000 or where they appeared. Without this information it is hard to gage the impact of this factor. The Court does note, however, that $50,000 is only 0.25 percent of the Institute of Justice's $20 million budget.

As to the sixth factor, Plaintiff alleges that it has used its trademarks continuously since 1991. One of Plaintiff's registered marks—U.S. Registration No. 3,830,071—IJ and Design— lists a date of first use in commerce of September 1991. Dkt.1, ¶ 29. However, it is not clear from the Complaint how long and how prominently Plaintiff has used the standalone "IJ."

Plaintiff also encourages the Court, in determining the strength of the standalone "IJ" to consider how frequently "IJ" is used in relevant fields, i.e. fields related to law, policy, and public communications on these subjects. The Fourth Circuit has considered how frequently a mark is used in other trademark registrations generally and in fields related to the plaintiff's in determining the strength of a particular mark. *See Synergistic Int'l, LLC v. Korman*, 470 F.3d 162, 174 (4th Cir. 2006) (finding Synergistic's "GLASS DOCTOR®" mark is "conceptually strong" because "although the word 'doctor' is commonly used in other industries, it is not commonly used in businesses dealing with glass or windshield installation and repair"); *Petro Stopping Centers, L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 93 (4th Cir. 1997) (concluding "that PETRO is a fairly weak mark" where "117 third-party federal registrations or applications for registration contain the word PETRO, sixty-three of which are for use in connection with petroleum or fuel-related goods and services," the plaintiff's field). Plaintiff

points out that Defendants have not presented any evidence that "IJ" is frequently used in other registered trademarks. However, at the preliminary injunction stage, the burden is on the Plaintiff to show a likelihood of confusion and Plaintiff has also not presented any evidence on this point.

As to the fourth and fifth factors, Plaintiff argues in its reply brief that over the past two decades it has grown into a nationwide organization with a budget of $20 million, thousands of individual donors, and a large social media presence. The Plaintiff has also provided evidence of articles from national news sources that reference the Institute of Justice, often calling it "IJ."

Defendants, in contrast, argue that the Institute of Justice's failure to produce a consumer survey supporting secondary meaning is significant and should weigh heavily against it. The Fourth Circuit has acknowledged that "[t]he absence of [consumer survey] evidence is telling," because such surveys are "generally thought to be the most direct and persuasive way of establishing secondary meaning." *George*, 575 F.3d at 395. The Court notes that this case is only at the preliminary injunction stage, and it may have been difficult for the Plaintiff to gather such survey evidence at such an early point in the litigation. On the other hand, Plaintiff has known about the infringing conduct for some time, as early as February of 2014.

The commercial strength of the standalone "IJ" mark is a close call. The Institute of Justice weakly discussed only some of the six factors and completely omitted the most important factor—consumer surveys. While it is clear that Plaintiff has used the standalone "IJ" in commerce and in advertising, it is not clear how long or how prominent this usage has been. On the information currently before the Court, this factor does not tend to favor either party. The Court will therefore treat the commercial strength of the standalone "IJ," and consequently the strength and distinctiveness of the mark, as neutral.

### (b) The Similarity of the Two Marks to Consumers

The Court next turns to the second factor of the "likelihood of confusion" analysis: how similar the two marks are. In assessing this factor courts consider "whether there exists a similarity in sight, sound, and meaning which would result in confusion." *George*, 575 F.3d at 396. In determining whether two marks are similar, courts "must examine the allegedly infringing use in the context in which it is seen by the ordinary consumer." *Anheuser–Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 319 (4th Cir. 1992).

Defendants direct this Court to conduct a side-by-side comparison of the Institute of Justice's registered trademarks and the Independent Journal Review's mark:



Defendants maintain that this side-by-side analysis reveals that the marks are not similar at all.

Plaintiff argues in response that a side-by-side analysis is an improper approach to this factor. In *What-A-Burger Of Virginia, Inc. v. Whataburger, Inc. Of Corpus Christi, Texas*, 357 F.3d 441, 450 (4th Cir. 2004), the Fourth Circuit instructed that "[a]n informed analysis of whether the likelihood of confusion exists cannot rest solely upon a 'side-by-side' comparison of the marks without regard to the marketplace in which they are used." Following this approach, when consumers do not see the two marks together in commerce, "it is inappropriate to focus on minor stylistic differences to determine if confusion is likely." *Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1115 (7th Cir. 1997). There is no evidence that the

14

marks ever appear together in the marketplace. Thus, a purely side-by-side analysis is insufficient and the Court will not restrict itself to comparing the minor stylistic difference between the parties' logos.

This side-by-side comparison of the parties' logos also does not compare the two marks at the heart of this case. As discussed above, Plaintiff has established that it has common law rights in the standalone "IJ" and it is complaining of Defendants' use of this standalone "IJ." As noted above, the Institute of Justice has used a standalone "IJ," in both serif and sans serif font, in its logo, in emails, online newsletter, holiday cards, calendars, advertisements, and promotional materials, and on its website and social media accounts. The Independent Journal uses "IJ" on its website and social media accounts, and in emails and online newsletters. After comparing the marks as they are used in the marketplace, the Court can conclude that the marks are often identical in sight and always identical in sound. Accordingly, the second likelihood of confusion factor weighs in favor of Plaintiff.

### (c) The Similarity of the Goods or Services that the Marks Identify

The third factor in the "likelihood of confusion" analysis is the similarity of the goods or services the marks identify. Courts "measure the similarity of services with respect to each party's actual performance in the marketplace." *See Anheuser–Busch*, 962 F.2d at 319. The goods or services at issue "need not be identical or in direct competition with each other." *George*, 575 F.3d at 397. "Because confusion may arise even where products are merely related, the court is to consider whether the public is likely to attribute the products and services to a single source." *Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc.*, 227 F. App'x 239, 244 (4th Cir. 2007) (quotation marks omitted). "An important function of this 'related goods'

concept is to protect trademark owners' ability to expand into associated markets in the future."
*Id.*

Defendants argue that the services provided by the Independent Journal are dissimilar to the services provided by the Institute for Justice because the Institute for Justice is primarily a law firm providing litigation services. Plaintiff, in contrast, argues that its services are "identical and/or highly related" to the services of the Independent Journal Review because both "operate in news dissemination, education and policy fields." While it is true that the Institute for Justice is primarily a law firm, it also maintains a website and social media accounts aimed at disseminating news stories, communicating with the public, and influencing readers. This service is similar to the services the Independent Journal provides: disseminating news online through a websites, an online newsletter, and several social media platforms. Because of this overlap, the Court finds "the public is likely to attribute the products and services" of the parties "to a single source." *See Renaissance Greeting Cards*, 227 F. App'x at 244. The Court does note that the Independent Journal Review also engages in some activities, such as sponsoring political debates, that the Institute of Justice is forbidden from engaging in. Nevertheless, based on the limited overlap of the parties good and services, the Court finds this factor favors the Institute of Justice.

### (d) The Similarity of the Facilities Used by the Markholders

The fourth factor directs the Court to analyze the similarity of facilities the two parties use in their businesses. Defendants argue the facilities are dissimilar because the Independent Journal Review exists only on the internet while the Institute of Justice uses the brick and mortar world of courtrooms to provide its services. Plaintiff argues both parties are using the Internet as the facility to provide the relevant services. As discussed in the previous section, the parties'

services overlap because although the Institute of Justice is primarily a law firm, it also engages in news dissemination and education. These activities, which overlap with the activities of the Independent Journal Review, occur on the Internet. Thus, because the overlapping services are provided through the same facilities, the Internet, the Court finds this factor favors Plaintiff.

The Court notes that it is significant that both parties are using the Internet to provide the relevant services and that the domain names of the parties' websites are very similar. *See Cardservice Int'l, Inc. v. McGee*, 950 F. Supp. 737, 741 (E.D. Va.) *aff'd*, 129 F.3d 1258 (4th Cir. 1997) ("Because of the nature of the internet and domain names in particular, this factor becomes even more important in cases of trademark infringement over the internet."). The Fourth Circuit has recognized that "a domain name is more than a mere internet address." A domain name "also identifies the internet site to those who reach it, much like a person's name identifies a particular person, or, more relevant to trademark disputes, a company's name identifies a specific company." *Id.* Because "only one party can hold any particular domain name" on the Internet, "[a] customer who is unsure about a company's domain name will often guess that the domain name is also the company's name." *Id.* In this case, the Court sees how a consumer searching for the Institute of Justice's website, <ij.org>, could easily search for and end up at the Independent Journal Review's website, <ij.com>. This scenario lends support to Plaintiff's case for a likelihood of confusion.

### (e) The Similarity of Advertising Used by the Markholders

Plaintiff omits all discussion of the fifth factor—the similarity of advertising used by the parties—in their opening brief. Plaintiff then only briefly addresses this factor in its reply brief. While Plaintiff has produced examples of its own advertising, it has not presented any examples of the Independent Journal Review's advertisements. It is unclear whether the Independent

Journal Review engages in advertising separate from its social media platforms. Accordingly, the Court concludes that this factor favors neither party.

### (f) The Defendant's Intent

As no discovery has been conducted, Plaintiff concedes that it does not know what Defendants' intent was when it started identifying itself as the "IJ Review" and then simply "IJ." However, Plaintiff contends that Defendants, at the very least, acted recklessly in adopting and expanding their use of IJ after being put on notice of the Institute of Justice's objections. Defendants argue that their "IJ" logo is so different from the Institute of Justice's registered trademarks that there is no way the Court could infer ill will from its actions. As there is no evidence on this point at this time, the Court concludes that this factor favors neither party.

### (g) Actual Confusion

"The seventh and most important factor [in the likelihood of confusion analysis] is evidence of actual confusion. Actual confusion can be demonstrated by both anecdotal and survey evidence." *George*, 575 F.3d at 398. "Evidence of the number of instances of actual confusion must be placed against the background of the number of opportunities for confusion." 2 Thomas McCarthy, *McCarthy On Trademarks and Unfair Competition* § 23:14. Thus, "[i]f there is a very large volume of contacts or transactions which could give rise to confusion and there is only a handful of instances of actual confusion, the evidence of actual confusion may receive relatively little weight." *Id.*

Plaintiff's Complaint alleged at least eight anecdotes demonstrating actual confusion. For example, Plaintiff alleges that the Center for Competitive Politics incorrectly attributed one of the Independent Journal Review's articles to the Institute for Justice. As another example, multiple tweets have referred to the Independent Journal Review while using the Institute of

18

Justice's Twitter handle @IJ. Plaintiff's reply brief provided two more recent examples of Twitter users confusing the parties' Twitter handles, including one incident in which a Twitter user mistakenly attributed an article published by the Independent Journal Review to the Institute of Justice and then urged others to unsubscribe to the Institute of Justice.

Defendants argue this handful of anecdotes is insufficient to demonstrate actual confusion considering the large number of people that visit the parties' respective websites. The Independent Journal Review gets over 20 million unique hits on its website every month and the Institute of Justice had 1.18 million page views last year. While it's true the number of anecdotes offered by Plaintiff pales in comparison to the number of "opportunities for confusion," the Court finds the few anecdotes of actual confusion quite compelling. Accordingly, the Court finds this factor favors the Institute of Justice.

### (h) The Quality of the Defendant's Product

The parties both concede that the quality of the Defendants' product is not relevant in this case. Consideration of this factor is "appropriate in situations involving the production of cheap copies or knockoffs of a competitor's trademark-protected goods." *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 467 (4th Cir. 1996). As this case does not involve knockoffs, the Court need not address this factor.

### (i) The Sophistication of the Consuming Public

The final likelihood of confusion factor is the sophistication of the consuming public. "[B]uyer sophistication will [generally] only be a key factor when the relevant market is not the public at-large." *Id.* The Fourth Circuit explained this approach to the final factor in *Sara Lee*: "If the typical consumer in the relevant market is sophisticated in the use of—or possesses an expertise regarding—a particular product, such sophistication or expertise may be pertinent in

19

determining the likelihood of confusion." *Id.* Both the Institute of Justice and the Independent Journal Review market their services to the public at large online. Accordingly, the Court need not consider this factor.

Defendants argue that this factor should weigh in its favor because the target consumers of the Independent Journal and the Institute of Justice have different levels of sophistication. However, Defendants do not cite any case law that directs district courts to compare the levels of sophistication of the parties' consumers in analyzing this factor. Accordingly, the Court declines to follow this approach.

### (j) Conclusion on the Likelihood of Confusion

Of the five factors the Court finds applicable in this case, four of the factors weigh in favor of the Plaintiff. The Court finds that the parties are using similar marks, that there is some overlap in the goods and services offered by the parties, that both parties are using the Internet to provide those overlapping goods and services, and that there is compelling evidence of actual confusion. The final applicable factor, the strength and distinctiveness of the mark, favors neither party because although the standalone "IJ" is suggestive, there is mixed evidence of the commercial strength of the mark. None of the applicable factors weighed definitively in favor of the Defendants. Taking all of the applicable factors together, the Court finds that the Institute of Justice will eventually successfully show there is a likelihood of confusion.

### (5) Conclusion on Likelihood to Succeed on the Merits

As explained above, Plaintiff has established that it is likely to successfully establish all four elements of trademark infringement under the Lanham Act. Accordingly, the Court finds that Plaintiff is likely to succeed on the merits of its claim, and has thus satisfied its burden as to the first element of its Motion for Preliminary Injunction.

B. *Likelihood that the Institute of Justice Will Suffer Irreparable Harm*

Under the *Winter* test, the Institute of Justice must next establish that it will suffer irreparable harm in the absence of a preliminary injunction. 555 U.S. at 20. *Winter* made clear that plaintiffs seeking preliminary relief must "demonstrate that irreparable injury is likely," not just possible, in the absence of an injunction. *Id.* at 22.

Prior to *Winter* the Fourth Circuit held that, "[i]n Lanham Act cases involving trademark infringement, a presumption of irreparable injury is generally applied once the plaintiff has demonstrated a likelihood of confusion, the key element in an infringement case." *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 273 (4th Cir. 2002). Plaintiff argues this presumption should apply as it has established a likelihood of confusion. However, it is not clear from the case law whether this presumption still applies after *Winter*. *Compare Diamonds Direct USA, Inc. v. BFJ Holdings, Inc.*, 895 F. Supp. 2d 752, 761 (E.D. Va. 2012) (applying presumption), *with Pro-Concepts, LLC v. Resh*, 2013 WL 5741542, at *21 (E.D. Va. Oct. 22, 2013) ("[I]t is unlikely that the presumption alleged in the context of trademark infringement remains viable after the Supreme Court's decision in *Winter*.").

Plaintiff next argues that the injury it is suffering is particularly acute because the Independent Journal is engaging in activities that the Institute of Justice is forbidden from engaging in, such as supporting political candidates and engaging in the political process. Plaintiff maintains that its reputation will be irreparably harmed if the public mistakenly believes that the Institute of Justice is engaging in political activities. In particular, millions of people will see the Independent Journal Review using the "IJ" during and surrounding the Republican debate in February. Because of the large exposure of this event, Plaintiff says it will suffer great harm if the Independent Journal is not enjoined from using the "IJ."

21

Defendants make two arguments in response. First, citing *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001), Defendants insist that the Court must balance the harm to the parties in the irreparable injury analysis. *MicroStrategy* was issued prior to *Winter* and it does not follow the preliminary injunction test laid out in *Winter*. The *Winter* test does not call for such balancing on the irreparable harm element.

Second, Defendants argue that the Institute of Justice's delay in bringing this action demonstrates it will not suffer irreparable harm. Defendants maintain that the Institute of Justice waited twenty months from the first purported actual confusion in February of 2014 until it brought the current action. Plaintiff insists the delay is justified because it was taking steps to resolve the dispute outside of court. The Institute of Justice contacted the Independent Journal Review in February of 2015. After several attempts to contact the Independent Journal Review and settle the dispute, Plaintiff, through counsel, sent a cease and desist letter to the Independent Journal Review on August 31, 2015. The parties then met to discuss the dispute for the last time on September 21, 2015. Notably, in August/September of 2015, the Independent Journal Review "re-branded" itself with its new logo, featuring "IJ." inside a rounded square, adopted the <ij.com> domain name and the @ijdotcom Twitter handle. Plaintiffs maintain that it was only after this re-branding that the confusion between the organizations became so pervasive and damaging that it decide to pursue litigation.

*Splitfish AG v. Bannco Corp.*, 727 F. Supp. 2d 461, 468 (E.D. Va. 2010), is similar to the instant case. The plaintiff in *Splitfish* waited eight months between discovering the defendant was infringing on its copyrights and seeking a preliminary injunction. The Court rejected the defendant's argument that the delay was evidence that the plaintiff would not suffer irreparable injury in the absence of a preliminary injunction because during that eight months plaintiff

"attempted to persuade defendants to cease the infringing action without resort to litigation" and gathered evidence to support its case.

Like in *Splitfish*, the Institute of Justice took steps to resolve the dispute outside of court. While the twenty month delay is lengthy, it is understandable that Plaintiff did not bring the current action until October of 2015 considering the very recent "re-branding" the Independent Journal underwent. This re-branding, which the Independent Journal Review undertook after being on notice of the dispute with the Institute of Justice, heightened the likelihood of confusion and, correspondingly, the Plaintiff's concern about such confusion. Because this event occurred shortly before Plaintiff filed this case, the Court declines to find that the delay in seeking a preliminary injunction is evidence that the Institute of Justice will not suffer irreparable harm absent an injunction.

Rather, the Court finds Plaintiff is likely to suffer irreparable harm if the injunction is not issued. Plaintiff's brand and reputation are currently being harmed by the Independent Journal's use of "IJ," which is confusing consumers. If this use is allowed to continue, Plaintiff will suffer an even greater harm come February with the national exposure of the Republican debate the Independent Journal Review is sponsoring. Accordingly, the Court finds Plaintiff has satisfied its burden on the second preliminary injunction factor.

### C. Balance of Equities

Under the *Winter* test, the Institute of Justice must next establish that the balance of equities tips in favor of granting the requested preliminary injunction. 555 U.S. at 20. Plaintiff primarily argues that the harm to its reputation and goodwill if the infringement is allowed to continue, particularly during the Republican debate, outweighs any cost to the Defendants. Plaintiff points out that if the injunction is issued the Defendants will not be stopped from

23

running the Independent Journal Review website or from sponsoring the Republican debate. Rather, Defendants will just be stopped from using "IJ" in connection with those activities.

Defendants argue that the equities tip in its favor because it has been promoting the Republican Debate for four months. This argument is not very persuasive considering the Independent Journal "re-branded" itself in August/September of 2015, after it was on notice of the dispute with the Institute of Justice, and considering that can continue to promote the debate using the name "Independent Journal Review." The Court, therefore, finds the balance of equities tips in favor of granting the injunction.

### D. *Public Interest*

Under the *Winter* test, the Institute of Justice must finally establish that it is in the public's interest to grant the preliminary injunction. 555 U.S. at 20. Plaintiff argues that it is in the public interest to grant the injunction because "[p]reventing consumers from being confused serves the public interest, . . . as does preventing trademarks from being used deceptively." *Toolchex, Inc. v. Trainor*, 634 F. Supp. 2d 586, 594 (E.D. Va. 2008) (citations omitted); *see also AMP Inc. v. Foy*, 540 F.2d 1181, 1185–86 (4th Cir. 1976). Defendants insist that "the public has an interest in seeing that trademark laws are not applied so broadly as to unfairly inhibit commerce." Dkt. 15, at 21. However, Defendants do not cite any cases acknowledging this interest. In addition, Defendants have not presented any compelling arguments or evidence that granting the injunction would unfairly inhibit commerce.

The Court has already found that the Institute of Justice has common law rights in the standalone "IJ," and that consumers are likely to confuse the parties' marks. The Court further finds that preventing this confusion and protecting established marks is in the public interest. Accordingly, the Court finds that granting the preliminary injunction is in the public's interest.

III.    **Conclusion**

Plaintiffs have established all four of the *Winter* factors.  First, if Plaintiffs continue to pursue this litigation, they are likely to ultimately succeed on the merits of their Lanham Act claim.  Plaintiffs have established that they have common law rights in the standalone "IJ" and that consumers are likely to confuse the Plaintiff's standalone "IJ" with the Independent Journal Review's use of "IJ."  Second, if the Independent Journal Review continues to use "IJ" in the interim, especially at the impending Republic debate, Plaintiff's brand and reputation will suffer irreparable harm.  Third, while Plaintiff's reputation and brand will suffer absent an injunction, Defendants will not face much hardship if the injunction is issued because the Independent Journal Review has alternative names it can use to promote itself and its products and services.  Finally, it is in the public interest to prevent the kind of consumer confusion that is occurring here and that will continue to occur without the requested injunction.

For all of these reasons, the Court ORDERS that Plaintiff's Motion for a Preliminary Injunction is GRANTED.  An appropriate Order shall issue outlining the parameters of the injunction.

_____ /s/

Liam O'Grady
United States District Judge

November 30, 2015
Alexandria, VA

25